UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
REINA CAMACHO,

                                  Plaintiff,                          **ORDER**

                  -against-                                          **21-CV-5811 (JW)**

KILOLO KIJAKAZI, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.
-----------------------------------------------------------------X
**Jennifer E. Willis, United States Magistrate Judge:**

        Plaintiff Reina Camacho brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and

Social Security Insurance ("SSI") under the Social Security Act (the "Act").   Both

Parties have moved for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c).   For the reasons stated below, Plaintiff's motion is GRANTED and

the Commissioner's motion is DENIED.

## BACKGROUND

### A.  Procedural History

        On May 9, 2017, Plaintiff submitted an application for DIB and SSI asserting

disability beginning February 20, 2017.   See Social Security Administration ("SSA")

Administrative Record (Dkt. No. 14) (hereinafter "R. __") at 244; 248.   At that time,

Plaintiff alleged Attention Deficit Hyperactivity Disorder ("ADHD"), bipolar, anxiety,

and depression.   R. at 91-92.   Later, Plaintiff would also allege disability stemming

from a herniated disc and a bone spur.   R. at 18.   The claim was initially denied on

July 14, 2017.  R. at 99; 108.  On August 22, 2017, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), R. at 120, which took place on July 30, 2019 and March 20, 2020, in front of ALJ Rosanne M. Dummer.  R. at 59; 41.

In a written decision dated March 26, 2020, the ALJ found that Plaintiff was not disabled as defined under the Act.  R. at 12.  Plaintiff subsequently requested Appeals Council Review.  R. at 241.  The Appeals Council denied that request on May 13, 2021, rendering the ALJ's decision final.  R. at 1.  Plaintiff brought this action on July 7, 2021, arguing that (1) Plaintiff's Condition met Listing 1.04A; (2) the ALJ's Residual Functional Capacity ("RFC") was unsupported by the evidence; (3) the ALJ's reliance on the medical experts' opinions was in error; and (4) the ALJ incorrectly considered the Vocational Expert's ("VE") testimony constituting reversible error. Dkt. No. 24 ("Pl. Mem.") at 22-30.

### B. __Personal Background__

Plaintiff was born on November 23, 1984.  Her education continued through the seventh grade.  R. at 64.  For many years, Plaintiff's employment consisted of cleaning homes and businesses. R. at 65.  She also worked at a bakery and babysat. Id.  Prior to her disability, Plaintiff was treated for depression, ADHD, and suicidal ideation.  Pl. Mem. at 2-3.  Plaintiff also has a history of neglect and assault, as well as domestic abuse, substance use, and intermittent homelessness.  Id. at 3; R. at 382 (record documenting the above from a hospital visit on December 24, 2014).  Plaintiff stopped working in June 2017 due to an inability to focus and stay on task in the

workplace, as well as physical limitations from back and hip pain.  R. at 66.  Plaintiff was in a motor vehicle accident on May 17, 2017.  Id.; Id. at 609.

**C.  <u>Plaintiff's Relevant Medical History</u>**

**i.   Deepika Singh, M.D.**

Dr. Deepika Singh has provided Plaintiff with psychiatric care since October 2017.  Pl. Mem. at 3.  In a Medical Source Statement, dated May 2, 2019, Dr. Singh noted Plaintiff's bipolar disorder, and that she was unfocused, manic, and had poor hygiene.  R. at 437.  Dr. Singh noted that Plaintiff was taking Depakote.  Dr. Singh opined that Plaintiff's impairments would cause her to be absent from work more than three times a month, and that her ability to understand, remember, and carry out instructions was affected by the impairments.  R. at 438.  Dr. Singh then indicated that Plaintiff had experienced an extreme loss in her ability to do several work-related tasks.  R. at 439-440.

**ii.  Stella Mansukhani, M.D.**

On September 29, 2017, Dr. Mansukhani evaluated Plaintiff following her motor vehicle accident.  R. at 441.  At the time, Plaintiff complained of neck pain, mid back pain, low back pain, and headaches.  Id.  Dr. Mansukhani concluded that Plaintiff had a cervical disc herniation, thoracic disc herniation, lumbar spine disc herniation, and posttraumatic headaches.  R. at 443.  Dr. Mansukhani recommended physical therapy, visits with a neurologist to treat the headaches, and monitoring of her pain by meeting with a pain specialist and continuing to take her medication.  Id.

### iii.    Julia Nourok, L.M.S.W.

On March 20, 2019, Ms. Nourok authored a letter stating that Plaintiff had been coming to the Upper Manhattan Mental Health Center since September 2017, attending weekly visits with a therapist and monthly visits with a psychiatrist. R. at 603. Ms. Nourok stated that Plaintiff was diagnosed with Bipolar I D/O and prescribed Depakote. Id. Ms. Nourok also noted Plaintiff's emotional support dog, Poochi. Id.

Ms. Nourok reported a history of missed appointments. See R. at 750-751; 756; 772; 782. On January 9, 2018, Ms. Nourok described Plaintiff as "all over the place a bit," and noted that Plaintiff "reported that she hadn't bathed since December." R. at 757. On February 1, 2018, Ms. Nourok noted that Plaintiff was "unable to give herself any structure and she is always falling behind." R. at 759. On several occasions Ms. Nourok observed that Plaintiff "rambles without focus." R. at 761; see also R. at 759. On August 8, 2018, Ms. Nourok discussed Plaintiff's cutting behavior with her. R. at 776-777.

### iv.    Kerah Williams, M.D. and Sonja Prystajko, L.C.S.W.

Dr. Williams, a family practitioner, met with Plaintiff on May 20, 2019. R. at 733. Plaintiff's chief complaints were physical pain and hip pain. Id. Dr. Williams found that Plaintiff experienced dizziness. Id. Plaintiff was positive for right hip and heel pain. Id. Plaintiff's depression and bipolar disorder were also noted. Id. Dr. Williams suggested certain medications, and changes in diet and exercise. R. at 735.

On June 26, 2019, Ms. Prystajko, a social worker associated with Dr. Williams's practice, submitted a Verification of Medicaid Transportation Abilities form, stating that Plaintiff should be enrolled for use of a taxi to get around.  Dr. Williams attested to the information on the form.  Id.  Ms. Prystajko stated enrollment in the program was required because of Plaintiff's mental health diagnosis, as well as her physical pain in the joints and from her heel bone spurs.  R. at 607-608.  Ms. Prystajko also noted that Plaintiff experienced intense pain when standing up after extended periods of sitting.  R. at 608.  Ms. Prystajko stated that "[b]ecause of this chronic pain, [Plaintiff] finds it difficult to climb steps or standing for lengths of time."  Id.

### v.   Wesley Stradone, M.D.

On September 28, 2018, Plaintiff met with Dr. Stradone of the City of New York's Office of Health and Mental Health Services.  R. at 597.  At the time, Plaintiff was facing eviction and was referred for psychiatric evaluation by Adult Protective Services as a result of that pending eviction.  Id.  Dr. Stradone found that "[a]s a result of [Plaintiff's] mental health condition, resultant functional limitations, and inability to understand and/or appreciate their limitations, the client is unable to manage their needs and/or finances."  R. at 599.  Dr. Stradone then recommended that a guardian ad-litem be appointed for Plaintiff's Landlord/Tenant Court proceedings.  Id.  Dr. Stradone attributed this to Plaintiff's unspecified bipolar disorder, unspecified personality disorder, and history of cannabis/cocaine use disorders.

### vi.    Haruyo Fujiwaki, Ph.D.

Plaintiff met with Dr. Fujiwaki on June 27, 2017 for a consultative examination.  R. at 432.  Dr. Fujiwaki found Plaintiff had symptoms of depression and anxiety, as well as manic symptoms.  R. at 432-433.  Plaintiff denied thought disorder, but Dr. Fujiwaki did note short-term memory deficits and concentration difficulties.  R. at 433.  Dr. Fujiwaki diagnosed Plaintiff with unspecified bipolar and related disorder, unspecified anxiety disorder, and cannabis use disorder in sustained remission.  R. at 434.  Dr. Fujiwaki recommended psychological and psychiatric treatment but found Plaintiff's prognosis to be fair.  R. at 434-435.

### vii.    Jaime Gutierrez, M.D.

Dr. Gutierrez initially evaluated Plaintiff on May 25, 2017.  R. at 609.  At the time, Plaintiff complained of headaches.  R. at 610.  Dr. Gutierrez found that Plaintiff's range of motion was "limited, restricted and painful."  R at 611.  Dr. Gutierrez recommended Plaintiff for an MRI, and suggested an orthopedic consultation, as well as meeting with a chiropractor, acupuncture, and pain management specialist.  R. at 614.

The MRI took place on June 26, 2017.  R. at 713.  That exam showed a L3-4 disc bulge with encroachment on the neural foramina, a L4-5 disc bulge with encroachment on the neural foramina, as well as straightening of lumbar lordosis, which may have represented pain or muscle spasm.  R. at 714.  Another MRI found further disc bulges and a mild kyphotic deformity.  R. at 717.

6

### viii.   Steven Horowitz, M.D.

Plaintiff initially met with Dr. Horowitz on November 8, 2017.  R. at 674.  Dr. Horowitz found that Plaintiff had lumbar pain, as well as tenderness over the cervical paravertebral musculature, and pain with rotation of the cervical spine.  R. at 675. Dr. Horowitz recommended that Plaintiff continue with physical therapy as well as her current medications, and also noted that Plaintiff wanted to proceed with a lumbar epidural injection.  R. at 676.  Plaintiff received a lumbar epidural steroid injection on November 8, 2017.  R. at 723.  Several follow up injections occurred through August 3, 2018.  R. at 724-732.  At several follow up visits through August 16, 2018, Plaintiff's diagnosis remained the same.  R. at 677-708.

On August 1, 2019, Plaintiff returned to Dr. Horowitz's office with bilateral foot pain due to a heel spur.  R. at 709.  Plaintiff was assessed with pain in the left ankle and joints of her left foot, and treatment was recommended as range of motion and massage with follow up if there was no improvement.  R. at 711.

### ix.   Orna Rauchwerger, M.D.

On February 25, 2019, Plaintiff met with Dr. Rauchwerger for her heel pain. R. at 743.  On March 14, 2019, Dr. Rauchwerger proscribed Naproxen, gave Plaintiff an injection, proscribed certain lotions, and instructed Plaintiff to continue her stretching exercises.  R. at 740-741.

**D. <u>The First Hearing</u>**

On July 30, 2019, Plaintiff appeared with her then-attorney, Erica Bullo, for a video hearing before ALJ Rosanne M. Dummer.  Cheryl Richardson, a vocational expert ("VE"), was also present.  R. at 59.

**i.   Plaintiff's Testimony**

Plaintiff began by testifying to her biographical details.  Plaintiff was 34 years old and had completed schooling through the seventh grade.  R. at 63-64.  Plaintiff could read and do basic math but has some difficulty writing.  R. at 64-65.  Generally, Plaintiff made about $13,000 a year.  R. at 65.  Plaintiff was self-employed cleaning homes and businesses, occasionally babysitting, and worked for a short time at a bakery.  <u>Id</u>.  Plaintiff's employment terminated when she was fired from her job at the bakery and found herself "unable to continue physically" in her self-employment because she "could not focus anymore."  R. at 66.  Plaintiff was also involved in a motor vehicle accident in 2017.  <u>Id</u>.  In 2018, Plaintiff was evicted from her home.  R. at 70.  Plaintiff could not articulate a typical day, stating that no day was the same for her.  R. at 71.

Plaintiff had an adult son and a daughter who was eleven at the time of the hearing.  Pl. Mem. at 17, n. 25.  She rarely did housework and was dependent on her children.  R. at 72; 74.  Her main activity was playing and drawing with her daughter.  R. at 73.  Plaintiff's son was in the process of attempting to become her home attendant because she required assistance with many things, including going out,

picking up groceries, picking up her medication, insuring she takes her medication, as well as household tasks such as cleaning, laundry, and pet care.  R. at 74.

Plaintiff testified to certain physical problems that prevented her from working.  In chief, Plaintiff suffered from lumbar herniations that caused a lot of pain in her lower back.  R. at 66.  While back pain is Plaintiff's chief physical complaint, she also suffers from foot and hip pain.  Id.  Plaintiff used a cane due to pain in her foot; she required assistance to stand in the mornings.  R. at 76.  Plaintiff's doctors told her that she could not walk or stand up for certain periods of time due to a torn fascia in her left foot and bone spurs in both her feet.  R. at 79.  Plaintiff testified that she could walk one block before having to stop.  R. at 80.

Plaintiff was taking Depakote for her mental health.  R. at 69.  She also saw a therapist every week.  R. at 70.  In October 2018, Plaintiff attempted to commit suicide.  R. at 76.  Plaintiff had trouble focusing and experienced anxiety attacks once or twice a month.  Id.  Plaintiff testified that she did not have friends and did not socialize.  R. at 76-77.  Plaintiff had trouble sleeping every night.  R. at 77.  Plaintiff had trouble making it to appointments on times, and occasionally missed them.  Id.

### ii.   VE Testimony

The VE classified Plaintiff's prior work stating "[t]he first DOT title is housekeeper.  DOT number is 381.687-014, SVP 2, exertional level is heavy and that is unskilled.  The next DOT title is bakery sales clerk.  DOT number is 290.477-018, SVP 3, exertional level is light and that is semi-skilled… The final DOT title is

babysitter.  DOT number is 381.677-010, SVP 3, exertional level is medium and that is semi-skilled." R. at 81.

The ALJ interjected to ask Plaintiff clarifying questions about her prior work. Plaintiff testified that when working as a housekeeper she had to lift buckets of water, mattresses, and laundry baskets.  R. at 81-82.  In response to a question about her babysitting work, Plaintiff testified that she cared for two little kids, and often had to lift them, particularly the younger child who she estimated weighed about the same as a bag of rice, perhaps 20 pounds.  R. at 82.

The ALJ then posed their first hypothetical:

> "[C]onsider an individual, should not do any heavy lifting, so the person is able to lift and carry about 50 pounds occasionally and 25 pounds frequently.  The person could sit about six of eight hours and stand or walk about six of eight hours.  The person should avoid work hazards, no dangerous moving machinery, no unprotected heights, no work on ladders or scaffolds.  The person could understand, remember, and carry out instructions for routine, repetitive type unskilled work.  The person could sustain attention and concentration for two-hour segments of time in an eight-hour day. The person could tolerate work related, task-oriented interactions with coworkers and supervisors.  And, as far as with the public, that would be brief and superficial with the public.  And the person could adapt to changes in a work setting or routine, repetitive type, unskilled work.  The person should not have to read instructions in order to learn how to perform a job.  They could learn by oral instructions or by demonstration to learn the job and then they could perform the job. It's just that they should not have to read instruction sheets in order to learn how to do a job. Could such an individual perform any of the claimant's past work?" R. at 83-84.

The VE responded that housekeeper could still be performed, but not bakery salesclerk or babysitter.  R. at 84.  The VE then clarified that the housework would be performed at a medium level.  Id.

10

The ALJ then asked the VE to consider Plaintiff's age, education, and past work history, and whether there were other jobs in the national economy that such a person could perform.  R. at 84.  The VE stated that there was other work, including stores laborer and counter supply worker.  Id.  The ALJ then inquired as to whether there were light jobs within the parameters given.  R. at 84.  The VE listed several, including router, marker, and room attendant.  R. at 85.

The ALJ then adjusted the hypothetical asking "[i]f the person is further limited as far as the postural, they could occasionally climb ramp and stairs, balance, stoop, kneel, crouch and crawl."  R. at 85-86.  The VE stated that those limitations would have no bearing on the housekeeper work, or any of the light jobs, but would preclude the two medium jobs of store laborer and counter supply worker.  R. at 86.

Finally, the ALJ asked "if a person has no ability to interact with others so they could not interact with a supervisor. They may be off task as much as 25 percent of the workday.  They may need extra breaks two to three times a day in addition to regularly scheduled breaks.  And, they may be absent from work three to four days a month.  Could such an individual perform any of the jobs you have mentioned or any jobs existing in the national economy?"  R. at 86.  The VE said no.  Id.

Plaintiff's attorney then asked the VE whether one absence during a probationary period would preclude employment.  R. at 87.  The VE stated that it depended on the employer.  R. at 88.  The attorney then asked what the limit was for being off task.  Id.  The VE stated it was no more than 15 percent or "nine minutes

per hour." Id.  The ALJ clarified whether only unscheduled absences would result in job termination, which the VE confirmed.  Id.

### E. <u>The Second Hearing</u>

A second telephonic hearing was held on March 20, 2020.  R. at 43.  Plaintiff was not present, but her attorney David Levine attended.  Id.  also present were two medical experts, John A. Pella, M.D., and Elizabeth Ann Kalb, Ph.D, as well as VE Cheryl Richardson.  Id.  The hearing followed the receipt of additional documentation from the Vein Clinic, an updated response from Dr. Pella, as well as additional information from the VE in response to interrogatories.  Id.  The hearing was requested by Plaintiff's attorney.  Id.

### i.   Dr. John A. Pella's Testimony

Plaintiff's lawyer asked Dr. Pella whether he agreed that Plaintiff's problems caused a "reduction in her activities of daily living causing her problems."  R. at 45.  Dr. Pella stated that he did not agree.  R.at 46.  Dr. Pella also testified that he agreed Plaintiff should be provided a sit/stand option, five minutes on the hour.  Id.  Dr. Pella was then dismissed.

### ii.  Dr. Elizabeth Ann Kalb's Testimony

Plaintiff's counsel asked Dr. Kalb about inconsistent attendance from Plaintiff with respect to appointments.  R. at 48.  Dr. Kalb confirmed that that was the case.  Id.  Plaintiff's counsel then asked Dr. Kalb about animals, but the record on this question was not clearly developed.  R. at 48-49.  Dr. Kalb was then dismissed.

### iii.   VE Testimony

Plaintiff's counsel noted that Dr. Kalb, the psychiatric medical expert, had stated that Plaintiff's attendance at appointments was inconsistent.  R. at 51. Counsel also noted that Dr. Pella, the physical medical expert, had agreed that Plaintiff required a sit/stand option of five minutes per hour.  Id.  Counsel then asked "if the five-minute change in position keeps the person, if the person is unable to do the work at an optimum pace, would that be off task time?"  R. at 51-52.  The VE testified that the time off task is four and a half minutes per hour for unskilled work, about ten percent of time, and then for skilled/semi-skilled work it goes up to fifteen percent.  R. at 52-53.  Plaintiff's counsel then asked what the maximum tolerance on an SVP 2 job would be for absences.  R. at 53.  The VE then testified that the "absentee tolerance is actually a little less than one day per month."  Id.

The ALJ then followed up with questions of her own.  In particular, the ALJ asked for further clarification on the time off task tolerance.  The VE testified that "the time off task tolerance is, is for unskilled work.  It's about ten percent of time, so that's equivalent to about four and a half minutes per hour, throughout the course of an eight-hour workday.  So, so with a five-minutes being, you know off task, no matter what it's for, then that actually precludes these jobs that I've actually provided, as well as work within the national economy."  R. at 54.  It was established that a five minute change of positions on the hour, if off-task, precluded those jobs.  R. at 55.

The ALJ then asked if the change of position happened at the workstation, would that take a person off task.  R. at 55-56.  The VE stated "not necessarily," but

13

clarified that "the off-task behavior is anything that is not relevant to being productive or doing, doing whatever your job is.  So, if the individual is able to change positions and they're still able to perform the duties of their job without any interruption, then that means they remain on task.  However, if they have to change positions and you know, kind of take their attention away from their whatever the duties of their job entails, then that would land to the individual being off task."  R. at 56.  It was confirmed that being off task at the workstation would be work preclusive.  Id.

### F. **The ALJ's Decision**

ALJ Dummer issued her decision on March 26, 2020.  R. at 12.  At the first step, the ALJ found that while Plaintiff had engaged in substantial gainful activity ("SGA") between February 2017 and June 2017, there had still been a continuous 12-month period where Plaintiff did not engage in SGA, satisfying this first step.  R. at 18.  At step two the ALJ found that Plaintiff suffered from the following severe impairments: "bipolar disorder, venous insufficiency, bilateral heel spurs, left ankle partial tear, cervical spine herniation, post L4/5 discectomy, lumbar spine disc bulges/herniation, thoracic kyphosis, and obesity."  Id.  Because Dr. Kalb stated ADHD, anxiety, and personality disorders are all symptoms of Plaintiff's bipolar disorder, the ALJ left bipolar disorder as the relevant severe impairment.  Id.  The ALJ also noted several non-severe impairments, including post-traumatic headaches that have since resolved, dizziness, and a history of cannabis abuse though Plaintiff has since quit.  Id. at 18-19.

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." R. at 19.  The particular listing in question is listing 12.04, regarding mental impairment.

The ALJ found that Plaintiff had a mild limitation in "understanding, remembering or applying information," a moderation limitation in "interacting with others," a moderate limitation with "regard to concentrating, persisting or maintaining pace," and a moderate limitation for "adapting or managing oneself."  Id. at 19-20.  The ALJ relied on Dr. Kalb's assessment throughout this finding.  As Plaintiff's mental impairments did not reach the paragraph B or paragraph C criteria, Plaintiff was found to not satisfy listing 12.04.  R. at 20.

The ALJ then held that Plaintiff had the following RFC:

"to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), per the jobs provided by the vocational expert.  The claimant could lift/carry twenty pounds occasionally and ten pounds frequently; it six of eight hours one hour at a time; stand three of eight hours one hour at a time; and walk two of eight hours thirty minutes at a time.  After an hour of work, she requires a sit/stand option or five minutes, at the workstation.  The claimant could occasionally push/pull and occasionally reach overhead with the bilateral upper extremities; she could frequently reach in other directions bilaterally.  The claimant could occasionally operate foot controls.  She should not work on ladders/scaffolds, at unprotected heights, and should not crouch or crawl.  The claimant could occasionally climb ramps/stairs, balance, stoop, and kneel; she could occasionally work with moving mechanical parts, and operate a motor vehicle.  The claimant could frequently tolerate humidity/wetness, pulmonary irritants, extremes of heat/cold, and vibrations.  Secondary to mental impairment, the claimant could understand, remember, and carry out instructions for routine repetitive unskilled tasks.  She could

15

sustain attention and concentration for two-hour segments of time in an eight-hour day.   The claimant could interact with coworkers and supervisors for work-related and task oriented contact; she could interact with the public for brief and superficial contact on an occasional basis. The claimant could adapt to changes in the work setting for a range of routine repetitive unskilled tasks." R. at 20-21.

With respect to the evidence proffered in the case, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. at 25.  Finally, the ALJ found that Plaintiff was unable to perform any past relevant work. R. at 31.

The ALJ concluded that there were jobs in the national economy that Plaintiff could perform, taking into account her age, education, work experience, and RFC.  R. at 32.  Examples included addresser, document preparer, and tube stuffer.  Id.  Based on the above, a finding of "not disabled" was made.  R. at 33.

## LEGAL STANDARD

### A. Scope of Judicial Review under 42 U.S.C. § 405(g)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

16

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and internal quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted). "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (internal citations omitted).

B. **Standard Governing Evaluation of Disability Claims by the SSA.**

To qualify for disability benefits, an individual must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The SSA's regulations establish a five-step process for determining a disability claim. See 20 C.F.R. § 416.920(a)(4).

> If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. At the first step, the agency will find nondisability unless the claimant shows that he is not working at a

> "substantial gainful activity." §§ 404.1520(b), 416.920(b). At step two, the [SSA] will find nondisability unless the claimant shows that he has a "severe impairment." Defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the [SSA] assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the [SSA] to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003).

"The applicant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012). "Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999).

## DISCUSSION

Plaintiff raises several arguments with respect to the ALJ's decision each of which is taken in turn, below.

### A. Whether Plaintiff's Condition Meets Listing 1.04A.

Plaintiff's first argument is that she meets Listing 1.04A. Pl. Mem. at 22. Listing 1.04 governs disorders of the spine "resulting in compromise of a nerve root (including the cauda equina or the spinal cord." Listing 1.04A further clarifies it applies to spine disorders with "[e]vidence of nerve root compression characterized by

neuro-anatomic distribution of pain limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. § 404, Subpart P, App'x 1, § 1.04A. Plaintiff argues that this Listing is met because "the record contains MRI evidence of building and herniated discs with encroachment on the neural foramina and spinal stenosis with nerve root impingement as well as EMG evidence of cervical radiculopathy," and there is substantial evidence of "decreased range of motion," "sensory or reflex loss," and positive straight leg raising."  Pl. Mem. at 22.

In response, Defendant argues that Plaintiff has the burden to demonstrate that she has met all the requirements of Listing 1.04A.  Opp. at 14.  As the record contains "numerous clinical findings of full (5/5) extremity muscle strength and sensation and intact or nearly intact reflexes," it is argued Plaintiff has not satisfied that burden.  Id. at 15.  Specifically, Plaintiff has not demonstrated a loss of muscle strength nor a reduction in sensation or reflexes.  Id.

While the ALJ devoted the majority of her analysis at step three to the question of whether Plaintiff met Listing 12.04, mental impairment, she did find Plaintiff's "impairments have not met or medically equaled a listing, including listings 1.02, 1.04, and 4.11."  R. at 19.  The ALJ also cited medical expert Dr. Pella who wrote, specifically with respect to Listing 1.04, that there was "no neurologic impairment" either with respect to the cervical or lumbar nerves."  Id.  The ALJ did not cite to any other part of the record in reaching this conclusion.  Id.

19

Though the ALJ did not discuss Plaintiff's failure to meet Listing 1.04 at length, the Second Circuit has found that even if an ALJ does not specifically address a particular listing, as long as the general conclusion is supported by substantial evidence the ALJ's determination should be upheld.  See Solis v. Berryhill, 692 F. App'x 46, 48 (2d Cir. 2017) (citing Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982) ("[T]he absence of an express rationale does not prevent us from upholding the ALJ's determination regarding appellant's claimed listed impairments, since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence.")).

While some evaluations of Plaintiff's condition noted limitations on her motor function and/or her reflexes, see, e.g., R. at 611, 646-646, 702, other parts of the record indicate that there were no such issues.  See, e.g., R. at 446, 449, 458, 471, 481, 484, 675, 679.  Of significance, several of these findings that there were no limitations to motor function and/or Plaintiff's reflexes are from Dr. Horowitz, who as discussed below Plaintiff suggests is more persuasive than the other medical experts. As such, there is substantial evidence in the record to support that Plaintiff did not suffer from motor loss or sensory or reflex loss.  The ALJ's determination at step three is affirmed.

**B.  Whether the ALJ's emphasis on the medical experts' opinions was error.**

Plaintiff's second claim is that the weight given to Dr. Pella and Dr. Kalb's opinions was error.  Pl. Mem. at 25.  As to Dr. Pella, Plaintiff takes issue with the ALJ's reliance on Dr. Pella's opinion, over that of Dr Gutierrez and Dr. Horowitz who

Plaintiff says are better able to evaluate Plaintiff.  Id. at 23.  Plaintiff points out that Dr. Gutierrez specializes in physical medicine and rehabilitation, while Dr. Horowitz is an orthopedist and therefore specializes in the pain affecting Plaintiff.  Id.  Dr. Pella, the Social Security medical expert, instead specializes as a pulmonologist. Plaintiff asserts that this specialization makes him less qualified to opine as to Plaintiff's limitations.  Id. at 24.

Defendant responds that it was not error to afford Dr. Pella greater weight and argues that the specialization of the expert is irrelevant.  Defendant cites Wright v. Berryhill, 687 F. App'x 45, 48 (2d Cir. 2017) in support.  The Court disagrees with Defendant that specialization is irrelevant.  In Wright, the medical expert "personally examined the Plaintiff and reached conclusions consistent with the objective medical evidence" that made his specialization in pediatrics (where Plaintiff was an adult) not an issue.  Id.  Further, the ALJ in Wright "adequately explained the reasons for his weighing of … all of the medical opinions submitted" thus leading the Second Circuit to find no reversible error.  Id.

As in Wright, the ALJ here explains why she gave greater weight to Dr. Pella. She writes:

> "Dr. Pella, M.D. medical expert, performed a longitudinal review of the record evidence on a couple of occasions, and his opinions are consistent with the overall record.  Dr. Pella is a former medical instructor, associate director of a hospital pulmonary unit, and was in private practice internal medicine/pulmonary disease.  Dr. Pella is Board Certified in Internal Medicine and Pulmonary Disease, and is a medical expert recognized by the Commissioner of Social Security. His opinions are persuasive because they are consistent with the overall record evidence and are adopted in the residual functional capacity."  R. at 28.

The subject file was referred to Dr. Pella twice.  R. at 27.  Dr. Pella then answered two sets of interrogatories.  Id.  As part of that, Dr. Pella noted various diagnoses of Plaintiff, "including venous insufficiency, cervical disc herniations, lumbar disc bulges/herniation, left ankle partial calcaneal tear, mild kyphosis in thoracic spine, bilateral heel spurs, and obesity."  Id.

The ALJ "adequately explained his reliance on Dr. Pella's opinion, as required by Wright.  See 687 F. App'x at 48.  As such, the Court does not find error here.

Plaintiff also argues that the ALJ "erred in her reliance on Dr. Kalb's opinion" which was similarly incomplete.  Pl. Mem. at 27.  However, Plaintiff does not specifically articulate what part of the RFC is erroneously supported by Dr. Kalb's allegedly deficient opinion; as such, it is not clear to the Court what error Plaintiff is claiming with this argument.  The ALJ also explained why she gave weight to Dr. Kalb's opinion:

> "Dr. Kalb, Ph.D., medical expert, performed a longitudinal review of the record evidence.  Dr. Kalb, a Clinical Psychologist, and a medical expert for many years, recognized by the Commissioner of Social Security.  The medical expert is familiar with social security disability evaluation, listings, rulings, and sequential analysis.  She is engaged in private practice psychology as a Clinical Psychologist, for individuals, groups, families, and organizations, for years to the present.  In addition, Dr. Kalb is in academia with numerous publications, as a clinical professor, and director of development programs of a medical school, for years to the present.  The medical expert's opinion is consistent with the overall record and is well reasoned.  Dr. Kalb's opinions are persuasive and incorporated in the residual functional capacity."  R. at 31.

As such, the ALJ's reliance on Dr. Kalb's opinion is also explained in accordance with Wright.

22

C. <u>**Whether the ALJ's Consideration of the VE's Testimony is Reversible Error.**</u>

Third, Plaintiff argues that the ALJ erred in not correctly considering the number of absences Plaintiff would be likely to incur in any employment role.  Pl. Mem. at 28.  Dr. Singh opined that Plaintiff would be absent more than three times a month.  <u>Id</u>.  Furthermore, the VE testified that Plaintiff would likely be subject to a 30-day probationary period during which no absences would be allowed; Plaintiff therefore concludes that she would not be able to pass through any probationary period due to her necessary appointments.  <u>Id</u>. at 29.  As a result, Plaintiff argues that had the ALJ properly considered Plaintiff's likely absences and time off task, she would have found that Plaintiff could not engage in fulltime work.  <u>Id</u>. at 30.

Defendant argues that "this argument is unavailing because substantial evidence supports the ALJ's RFC determination, which did not find that Plaintiff was so limited," referring to Plaintiff's likely number of absences.  Opp. at 24.  Defendant notes that the ALJ did consider Dr. Singh's opinion and did not find that opinion supported by Dr. Singh's own treatment notes.  <u>Id</u>.  Defendant also cites case law for the proposition that absenteeism, even due to necessary medical visits, does not constitute absenteeism.  Opp. at 25 (collecting cases).

The ALJ did consider Dr. Singh's opinion and found it "not persuasive and inconsistent with the record."  R. at 29.  The ALJ noted that while the psychiatrist's treatment plan reviews were in the record, the treatment records themselves were not submitted.  <u>Id</u>.  Dr. Kalb found that the limitations Dr. Singh proposed were not

23

supported by Ms. Nourak's clinical notes. <u>Id</u>. Furthermore, Dr. Singh's own treatment notes from April 2019 showed an improvement in Plaintiff's anxiety and demeanor. <u>Id</u>. In evaluating Dr. Singh's opinion and finding it not persuasive the ALJ considered the evidence available in the record, the opinion of the medical expert, and the reality of Plaintiff's lived experience. <u>Id</u>.; <u>see</u> <u>Smith v. Berryhill</u>, 740 F. App'x 721, 724-726 (2d Cir. 2018) (finding that where a treating physician's opinion was undermined by the physician's treatment notes, the ALJ was allowed to discount or reject those opinions even in the absence of explicitly rebutting evidence).

As to the VE, while she did testify that more than one absence a month would be "work preclusive," R. at 87, upon clarification the VE stated that preclusion only applied to unscheduled absences. R. at 88. To the extent Plaintiff is concerned about missing work due to her appointments and treatments, presumably those would all be scheduled in advance. Thus, the VE's testimony is consistent with the evidence on the record, and the RFC as based on it is supported by substantial evidence. As for whether absences specifically during a probationary period were work preclusive, the VE testified that it "depends on the employer." R. at 87-88. This indicates that there are jobs in the national economy that would allow Plaintiff to miss days, assuming they were scheduled, and still pass through a probationary period.

The Court finds that the ALJ's consideration of the VE's testimony was not reversible error, and the RFC was consistent with said testimony.

24

### D. **Whether the ALJ's RFC is Supported by the Evidence.**

Lastly, Plaintiff argues that the RFC is not supported by substantial evidence. In support of this argument, as discussed above Plaintiff argues Dr. Pella lacks the specialized expertise to opine on Plaintiff's limitations.  Pl. Mem. at 24.  Plaintiff also argues that more weight should have been given to Dr. Gutierrez and Dr. Horowitz due to their relative areas of expertise (physiology and orthopedy, respectively), and because they were Plaintiff's treating physicians.

Defendant correctly points out, the treating physician rule for the evaluation of social security cases was abolished when the regulations were changed.  See 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  For claims filed on or after March 27, 2017, the treating physician rule is no longer applied.  See Schillo v. Kijakazi, 31 F.4th 64, 71 n.1 (2d Cir. 2022).  The agency no longer "defer[s] or give[s] any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Plaintiff's] medical sources." 20 C.F.R. § 404.1520c(a).  Instead, the treating physician rule was replaced by 20 C.F.R. § 404.1520c, which lists several factors that are to be considered when evaluating medical opinions.  The most important factors are supportability and consistency.  20 C.F.R. § 404.1520c(b)(2).  However, the ALJ must also consider the relationship with the claimant, including: (i) length of the treating relationship; (ii) frequency of examinations; (iii) purpose of the treatment relationship; (iv) extent of the treatment relationship; and (v) examining relationship.  20 C.F.R. § 1520c(c)(3)(i)- (v).  While this must be considered, the ALJ is not required to expressly explain their

25

reasoning on this factor.  See Navedo v. Kijakazi, 20-cv-10013 (JLC), 2022 WL 2912986,  at *7 (S.D.N.Y. July 25, 2022) (citing 20 C.F.R. §404.1520c(b)(2)).

However, this Court finds it difficult to reach a conclusion on whether the correct weight was accorded to Dr. Horowitz's and Dr. Gutierrez's opinions.  The ALJ's decision does not discuss their opinions by name, or generally separate them out.  The ALJ finds "[s]everal statements from primary care providers regarding the claimant's inability to work as a babysitter" not persuasive, but cites to the opinions of medical professionals other than Dr. Horowitz and Dr. Gutierrez when evaluating those claims.  R. at 26.  Subsequently, the ALJ finds that "the claimant was advised to avoid heavy lifting or straining for three days" and found that opinion partially persuasive.  Id.  This opinion is from Dr. Horowitz, however the ALJ's evaluation of the persuasiveness of Dr. Horowitz is limited to this one, discrete point.  The ALJ provides no further color on which opinions from which doctors she accords which level of weight.

"[T]he crucial factors in any determination [made by the ALJ] must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence."  Brown v. Commissioner of Soc. Sec., 15-cv-4913 (RJS) (JCF), 2016 WL 7637285, at *10 (S.D.N.Y. June 29, 2016) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); see also Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 422 (S.D.N.Y. 2009) ("It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [her] reasoning to permit the reviewing court to judge the adequacy of [her] conclusions.").  Here, the

ALJ has not provided a specific and sufficient explanation, particularly when it comes to how she evaluated the specific medical opinions in this record, to allow for meaningful review by this Court.

For this reason, the case is remanded for further consideration.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion (Dkt. No. 24) is GRANTED, and the Commissioner's motion (Dkt. No. 27) is DENIED.

SO ORDERED.

DATED:   New York, New York
          September 29, 2022

JENNIFER E. WILLIS
United States Magistrate Judge

27